## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **UPTOWN GRILL, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO: 13-6560 c/w**<br>**14-810; 14-837** |
| **MICHAEL LOUIS SHWARTZ, ET AL** | **SECTION: "H"(4)**<br>**(Applies to All Cases)** |

### <u>ORDER AND REASONS</u>

Before the Court is Motion for Summary Judgment (Doc. 194) filed by
Uptown Grill, LLC.  For the following reasons, the Court finds that the Bill of
Sale clearly and unambiguously transferred the disputed trademarks to Uptown
Grill, LLC.   Motion for Summary Judgment is GRANTED.

### BACKGROUND

This consolidated matter involves a protracted dispute over the ownership
rights to certain intellectual property associated with the famous Camellia Grill
restaurant in New Orleans.  In the various suits, two business entities each

1

claim to own the intellectual property associated with the restaurant.

In the lead case, Uptown Grill, LLC ("Uptown Grill")[1] seeks a judgment against Michael Shwartz, Camellia Grill Holdings, Inc. ("CGH"), and Camellia Grill, Inc.[2] (jointly referred to as the "Shwartz parties") declaring that "(1) it owns the trademarks, etc. that are located within or upon the property 626 South Carrollton Avenue, and (2) that its continued use of the trademarks, etc that it purchased is lawful in all respects."[3]

In the consolidated cases, Camellia Grill Holdings, Inc. (CGH) seeks judgment against Defendants, Hicham Khodr; The Grill Holdings, LLC ("Grill Holdings"); Chartres Grill, LLC; RANO, LLC; Uptown Grill, LLC; Uptown Grill of Destin, LLC; K&L Investments, LLC; and Robert's Gumbo Shop, LLC (jointly referred to as the "Khodr parties").[4] CGH alleges that the defendants, acting as a single business enterprise, are unlawfully using the contested Camellia Grill trademarks. CGH seeks damages for trademark infringement and requests that the defendants be enjoined from further infringement.

For many years prior to Hurricane Katrina, the Shwartz family owned and operated Camellia Grill. Under the Shwartz family ownership, the restaurant on Carrollton Avenue was the only location of operation. In 1999, Shwartz formed CGH for the sole purpose of holding federally registered trademarks

---

[1] Uptown Grill is wholly owned by Hicham Khodr.

[2] CGH and Camelia Grill, Inc. are wholly owned by Michael Shwartz.

[3] Doc. 1, p. 6.

[4] The Grill Holdings, LLC; Chartres Grill, LLC; RANO, LLC; Uptown Grill; LLC; Uptown Grill of Destin, LLC; K&L Investments, LLC; and Robert's Gumbo Shop, LLC are all wholly owned by Hicham Khodr.

associated with the restaurant.

In August of 2005, the city of New Orleans was decimated by the landfall of Hurricane Katrina. Shwartz relocated to Grenada, Mississippi in the wake of the storm, and Camellia Grill remained closed. At some point during the year following Katrina, Shwartz and Khodr negotiated the sale of Camellia Grill. In August of 2006, the parties, through various entities, executed three contracts: (1) the Cash Sale, (2) the Bill of Sale, and (3) the License Agreement.

The Cash Sale was executed on August 11, 2006. Pursuant to the Cash Sale, Michael Shwartz sold the immovable property located at 626 Carrollton Avenue (the home of Camellia Grill) to RANO, LLC for the sum of $490,000.00.

On August 11, 2006, Michael Shwartz, Camellia Grill, Inc., and CGH executed a Bill of Sale in favor of Uptown Grill, LLC, for the sum of $10,000.00. The Bill of Sale transfers:

> [I]nterest in and to the following tangible personal property located within or upon the real property described in Exhibit "A" . . . and within or upon the buildings and improvements located thereon:
>> All furniture, fixtures and equipment, cooking equipment, kitchen equipment, counters, stools, tables, benches, appliances, recipes, trademarks, names, logos, likenesses, etc., and all other personal and/or movable property owned by Seller located within or upon the property described in Exhibit A annexed hereto and within or upon the buildings and improvements thereon.[5]

On August 27, 2006, CGH and Grill Holdings executed the License Agreement, in which the parties acknowledged that CGH held the now-disputed

---

[5] Doc. 194–3.

3

federally registered trademarks and granted Grill Holdings exclusive license to use the trademarks for the sum of $1,000,000.00, plus royalties.

Sometime following the transactions in 2006, disagreements arose regarding the License Agreement and litigation ensued.  The Licensing Agreement was ultimately cancelled by a Louisiana state court based on the finding that Grill Holdings had breached its obligations under the contract.[6] That order has become final on direct appeal.

While the state judgment cancelling the License Agreement was on appeal, CGH filed suit in this Court alleging that Grill Holdings' continued use of the Camellia Grill trademarks violated the Lanham Act, and seeking a preliminary and permanent injunction prohibiting Grill Holdings from using the marks, including the facade of the Camellia Grill building.[7]  After, this Court denied CGH's Motion for Preliminary Injunction,  CGH filed a Motion for Voluntary Dismissal, which this Court granted.

While the Motion for Voluntary Dismissal was pending, Uptown Grill filed 13–6560, the lead case in this litigation. Uptown Grill alleges that it owns the trademarks that are located "within or upon the property" at 626 South Carrollton Avenue, that its continued use of the trademarks is lawful, and that it is entitled to a declaratory judgment to that effect.

After the Motion for Voluntary Dismissal was granted and while the

---

[6] See *The Grill Holdings, L.L.C. v. Camellia Grill Holdings, Inc.*, 120 So. 3d 294 (La. App. 4 Cir. 2013).

[7] See *Camelia Grill Holdings, Inc. v. City of New Orleans, et al*, No. 13–5148 (E.D. La. filed July 23, 2013).

Uptown Grill claim was pending, CGH initiated suit in state court asserting claims for trademark infringement by filing a supplemental pleading in the then-closed state court litigation.  The Khodr parties removed the litigation to this Court, invoking this Court's federal question jurisdiction under the Lanham Act, and the litigation was consolidated with the declaratory action.  After the Court denied a motion to remand, CGH amended its complaint to explicitly assert Lanham Act claims.

At its core, this Motion turns on whether the language of the Bill of Sale was clear and unambiguous and, if so, what was transferred to whom.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[8]  A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[9]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor.[10]  "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden

---

[8] Fed. R. Civ. P. 56(c) (2012).

[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[10] *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528 (5th Cir. 1997).

5

shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[11]   Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[12]   "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[13]   "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[14]   Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[15]

## LAW AND ANALYSIS

The questions before the Court are relatively straightforward, even if the answers are not.  On August 11, 2006, Michael Shwartz sold the building and real estate of Camelia Grill to RANO, LLC.  On that same date, the Shwartz parties and Uptown Grill executed the Bill of Sale at issue.   CGH and Grill

---

[11] *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995).

[12] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[13] *John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).

[14] *Badon v. R J R Nabisco, Inc.*, 224 F.3d 382, 394 (5th Cir. 2000) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)).

[15] *Boudreaux v. Banctec, Inc.*, 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

Holdings entered into the License Agreement two weeks later.  The current Motion requires the Court first to determine whether the terms of the Bill of Sale were clear and unambiguous and, if so, what the Bill of Sale transferred to Uptown Grill.

### I. Bill of Sale

The Bill of Sale expressly invokes Louisiana law.  "According to the Louisiana Civil Code, '[i]nterpretation of a contract is the determination of the common intent of the parties.'"[16]  In probing this intent, a court looks first to the four corners of the contract.[17]  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[18]  "Each provision of a contract must be interpreted in light of the other provisions, and a provision susceptible of different meanings must be interpreted with a meaning that renders it effective rather than one which renders it ineffective."[19]  "When a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties."[20] "The rules of contractual interpretation simply do not

---

[16] *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007) (quoting La. Civ. Code art. 2045).

[17] *See John Paul Saprir, LLC v. Yum! Brands, Inc.*, 106 So. 3d 646, 652 (La. App. 4 Cir. 2012) (citation omitted).

[18] La. Civ. Code art. 2046.

[19] *Lis v. Hamilton*, 652 So. 3d 1327, 1330 (La. 1995) (citations omitted).

[20] *Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 112 So. 3d 187, 192 (La. 2013).

authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clarity the parties' intent."[21]

The determination of whether a contract is clear or ambiguous is a question of law.[22]  "When a contract can be interpreted from the four corners of the instrument, the question of contractual interpretation is answered as a matter of law, and summary judgment is appropriate."[23]  If, on the other hand, the court makes a threshold finding that the contract is ambiguous, an issue of material fact exists as to the intention of the parties, and summary judgment is rarely appropriate.[24]  Accordingly, the threshold inquiry is whether the Bill of Sale is clear and unambiguous.

The Bill of Sale was executed by Michael Shwartz, Camellia Grill, Inc., CGH,[25] and Uptown Grill.[26]  The contract recites that:

> FOR AND IN CONSIDERATION of the price and sum of TEN THOUSAND AND NO/100 ($l0,000.00) DOLLARS, which Purchaser has well and truly paid unto Seller, the receipt and sufficiency whereof is acknowledged, Seller does by these presents, hereby sell, transfer, and convey unto Purchaser, its successors and assigns, all of Seller's right, title and interest in and to the following tangible

---

[21] *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 589 (La. 2007).

[22] *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 764 (La. 1994) (citation omitted).

[23] *Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters Subscribing to Cover Note 95-3317(A)*, 837 So. 2d 11, 24 (La. App. 1 Cir. 2002) (citation omitted).

[24] *See Orleans Parish Sch. Bd. v. Lexington Ins. Co.*, 118 So. 3d 1203, 1212 (La. App. 4 Cir. 2013) (citation omitted).

[25] The contract refers to these parties collectively as "Seller."

[26] The contract refers to Uptown Grill as "Purchaser."

personal property located within or upon the real property described
in Exhibit "A"' annexed hereto and within or upon the buildings and
Improvements located thereon:

> All furniture, fixtures and equipment, cooking
> equipment, kitchen equipment, counters, stools, tables,
> benches, appliances, recipes, trademarks, names, logos,
> likenesses, etc., and all other personal and/or movable
> property owned by Seller located within or upon the
> property described in Exhibit A annexed hereto and
> within or upon the buildings and improvements thereon
> (the "Personal Property").[27]

The parties vehemently disagree on the proper interpretation of the
contract. Uptown Grill contends that the contract clearly and explicitly conveys
ownership of all "trademarks" to it. The Shwartz parties offer three arguments
to the contrary. First, they argue that the contract's use of the phrase "tangible
personal property" necessarily limits the contract to such items or renders the
contract ambiguous. Second, they argue that, even assuming that the contract
transferred ownership of the trademarks, such a transfer is not permitted under
the law. Finally, the Shwartz parties argue that this Court should consider
parol evidence regarding the intent of the parties.

The Shwartz parties' first argument, that the inclusion of the term
"tangible personal property" limits the terms of the contract or creates ambiguity
within it, is without merit. They contend that, under Louisiana law, trademarks
are incorporeal movable property and thus not "tangible." According to the
Shwartz parties, the clear wording of the contract limits the assets transferred

---

[27] Doc. 194–3. Exhibit A is a legal description of the property on which the Carrollton
Avenue restaurant sits.

to tangible property.  Alternatively, the Shwartz parties argue that the inherent conflict between the term "tangible personal property" and the term "trademarks" renders the contract ambiguous.

While the Shwartz parties correctly contend that trademarks and other intellectual property rights are not tangible, this argument ignores a fundamental rule of contract interpretation.  "[I]n the interpretation of . . . contracts, the specific controls the general."[28]  To the extent that the general phrase "tangible personal property" conflicts with the specific provision purporting to transfer all "recipes, trademarks, names, logos, likenesses," this Court must enforce the specific provision.  Moreover, Louisiana law requires "that each provision of a contract must be interpreted in light of the other provisions, and a provision susceptible of different meanings must be interpreted with a meaning that renders it effective rather than one that renders it ineffective."[29]  The Shwartz parties would have this Court ignore specific entries in this contract.  This the Court cannot do.

This Court finds that the term "tangible personal property" can be reconciled with the rest of the contract such that *all* of the words in the contract have meaning, without doing violence to any provision.  This Court finds that all tangible personal property located at 626 Carrollton Avenue was transferred, as

---

[28] *Corbello v. Iowa Prod.*, 850 So. 2d 686, 704 (La. 2003) (superseded by statute on other grounds); *see also Mazzini v. Strathman*, 140 So. 3d 253, 259 (La. App. 4 Cir. 2014); *Centerlink, Inc. v. Sarpy Properties, LLC*, 78 So. 3d 776, 781 (La. App. 5 Cir. 2011); *Jessop v. City of Alexandria*, 871 So. 2d 1140, 1146 (La. App. 3 Cir. 2004); *Aikman v. Thomas*, 887 So. 2d 86, 90 (La. App. 1 Cir. 2004).

[29] *Lis*, 652 So. 3d at 1330.

well as the specifically identified intangible property of "recipes, trademarks, names, logos and likenesses." This reading comports with the Court's obligation to construe specific terms as controlling over general terms and to ensure that the contract is interpreted in a manner that renders each term effective.

The Shwartz parties additionally argue that a transfer of the trademarks could not have legally occurred in the Bill of Sale because the good will associated with the marks was not explicitly transferred in the contract. The Court disagrees.

Good will is essentially the good reputation that a business enjoys.[30] This positive reputation results in the expectancy of continued patronage.[31] It is "the total of all the imponderable qualities that attract customers to the business."[32] "A trademark is merely a symbol of good will and has no independent significance apart from the good will that it symbolizes."[33]  Therefore, a trademark cannot be transferred separate from the good will it symbolizes.[34] The sale of a trademark without the good will it represents is an "assignment in gross" and is invalid.[35]  "The purpose of the rule prohibiting the sale or assignment of a trademark in gross is to prevent a consumer from being misled

---

[30] *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993).

[31] *Id.*

[32] *Id.* at 556.

[33] *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999).

[34] *Id.*; *see also* 15 U.S.C. § 1060 ("A registered mark or a mark for which application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark.").

[35] *Sugar Busters*, 177 F.3d at 265.

or confused as to the source and nature of the goods or services that he or she acquires."[36]  Courts have not required that contracts transferring ownership of trademarks explicitly mention the good will of the marks.  Rather, because "good will is an intangible, evasive concept . . . courts will look to see where the tangible assets of a company went in order to determine whether an alleged assignee of a mark in fact obtained the good will of the assignor."[37]  As a leading commentator has recognized, "if an assignee buys a total business, including physical assets, trade secrets, formula, drawings, and customer lists of another, there seems little doubt that it has purchased the 'good will' of the seller."[38]

The Shwartz parties correctly note that trademarks may not be transferred without the good will of the business to which they are attached; they may not be sold in gross.  The Shwartz parties go further, however, and seem to argue that good will cannot be transferred without its express mention in the contract.  This argument misses the point.  In the Bill of Sale, the Shwartz parties clearly and unambiguously transferred "recipes, trademarks, names, logos, likenesses, etc. and all other personal and/or movable property."  The Bill of Sale transferred every single asset of Camellia Grill to Uptown Grill.  It is clear to this Court that Camellia Grill was sold lock, stock, and barrel.  Pursuant to well-settled trademark law, the Court must conclude that the good will of Camellia Grill was transferred with the sale of the entire business.

---

[36] *Id.*

[37] 3 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:23 (4th ed. 2015).

[38] *Id.*

12

In this Motion, the Shwartz parties offer one final argument.   They contend that the Court must consider the conduct of the parties after the Bill of Sale to properly interpret the contract.   Louisiana Civil Code article 2053 provides that "a doubtful provision [in a contract] must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."   The plain text of the article counsels against its application in this case—there is no "doubtful provision" in the Bill of Sale. Having found that the contract was clear and unambiguous, this Court may not resort to extrinsic evidence.   Accordingly, the Court may not consider the conduct of the parties.[39]

It is, however, possible to read this argument another way.   While the Shwartz parties have not explicitly made this argument, perhaps they contend that a literal application of the language in the Bill of Sale produces an "absurd" result.   Louisiana law permits courts to consider extrinsic evidence in search of the parties' intent where the literal interpretation of a contract leads to absurd results.[40]   The Shwartz parties point to the conduct of the parties after the Bill of Sale was executed, along the terms of the document itself, to argue that a literal application of its terms is objectively unreasonable.   The Court is not convinced.

---

[39] *See* La. Civ. Code art. 2053 cmt. a ("This Article . . . clarifies the law by providing that courts may resort to equity for guidance only when the meaning of a provision is in doubt. They may not do so in order to enlarge or restrict the scope of a contract or provision whose meaning is apparent.").

[40] *Halphen v. Borja*, 961 So. 2d 1201, 1205 (La. App. 1 Cir. 2007).

13

CGH argues that the price reflected in the Bill of Sale, $10,000, is irreconcilable with the value of the Camellia Grill name. In support of this argument, it cites the License Agreement in which Grill Holdings paid one million dollars for the right to use the Camellia Grill trademarks. This fact alone does not render a result "absurd." The Fifth Circuit has cautioned that, "although a business decision may be unwise, imprudent, risky, or speculative, it is not necessarily 'absurd.' We decline to allow contracting parties to escape the unfortunate and unexpected, though not objectively 'absurd,' consequences of a contract by subsequently characterizing their consequences as 'absurd.'"[41] Here, the Shwartz parties agreed to accept the sum of $10,000 for the assets described in the Bill of Sale. At the time of the purchase, the restaurant had been closed for about one year. The Court has been presented a dearth of evidence upon which it may rely to determine the actual value of the trademarks. In the absence of any objective evidence regarding the value of Camellia Grill, the Court cannot say that $10,000 is an "absurd" valuation. Indeed, in the absence of any evidence, it is equally likely that the one million dollar valuation is the absurd result. Merely demonstrating that a different party valued an asset differently at a different time does not demonstrate than the first valuation is objectively absurd.

On the basis of these facts, the Court simply cannot find that the literal application of the Bill of Sale's terms rises to the level of absurdity. The fact that the Shwartz parties appear to be suffering from an acute case of sellers' remorse

---

[41] *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Circle, Inc.*, 915 F.2d 986, 991 (5th Cir. 1990).

does not render the terms of the Bill of Sale *objectively* absurd.  Accordingly, the Court holds, as a matter of law, that the terms of the Bill of Sale clearly and unambiguously transfer ownership of the trademarks associated with the operation of the Camellia Grill restaurant on Carrollton Avenue to Uptown Grill.

## II. License Agreement

The Court must next determine the effect, if any, of the License Agreement.  The License Agreement was executed between CGH and Grill Holdings.  In the agreement, the parties stipulated that CGH owned Camellia Grill's intellectual property.  The agreement further provided that CGH licensed the use of the property to Grill Holdings.  The agreement did not require that Grill Holdings pay royalties on the restaurant operations at the Carrollton location but did require the payment of royalties on any future restaurants and all merchandise sales.  The agreement was cancelled by a Louisiana state court. CGH argues that the License Agreement is conclusive evidence that CGH retained ownership of the trademarks in dispute or, alternatively, that the agreement creates ambiguity in the Bill of Sale.  The Court will address these arguments in reverse order.

Where, as in this case, the Court finds that the contract is clear and unambiguous "no further interpretation may be made in search of the parties' intent and courts must enforce the contract as written."[42]  Having found that the plain terms of the Bill of Sale are clear and unambiguous, the Court cannot search for ambiguity in other places, including the License Agreement.

---

[42] *Sims v. Mulhearn Funeral Home, Inc.*, 956 So. 2d 583, 589 (La. 2007); La. Civ. Code art. 2046.

The first argument is less clear.  It seems that CGH argues that, even if the Bill of Sale unambiguously transfers ownership of the trademarks, the License Agreement modifies the Bill of Sale to provide that CGH retained the trademarks.  This argument, however, overlooks a key difference between the two contracts: The Bill of Sale transferred property to Uptown Grill, whereas the License Agreement licensed the trademarks to Grill Holdings. "Once [a] contract is complete, it is not subject to further modification by either party without the consent of the other."[43]  Clearly, the provision in the Bill of Sale transferring ownership of the trademarks to Uptown Grill may not be modified without the consent of Uptown Grill.  CGH has not offered the Court a scintilla of evidence suggesting that Uptown Grill consented to the License Agreement.

Though not specifically argued in these Motions, the Court notes that CGH alleged in the consolidated cases that the Khodr parties are a single business enterprise.[44]  If the Khodr parties are such an enterprise, then the consent of Grill Holdings to the license agreement could equally bind Uptown Grill.  The Court cannot conclude that the Khodr parties are a single business enterprise for several reasons.  First, that defense was not pled in the declaratory judgment action.  Second, CGH failed to raise this argument in response to these motions.  Finally, even if the Court considers the single enterprise allegation, CGH has failed to provide evidence upon which this court can rely to make such a finding.

---

[43] *Woods v. Morgan City Lions Club*, 588 So. 2d 1196, 1200 (La. App. 1 Cir. 1991).

[44] This allegation is found in the consolidated cases only and is not pled in the declaratory action.

16

Under Louisiana law, business organizations are generally regarded as separate entities.[45]  On the other hand, "where a single corporation has been fragmented into branches that are separately incorporated and are managed by a dominant or parent entity . . . the courts have held the dominant or parent corporation liable for the obligations of its branches whenever justice requires protection of the rights of third persons."[46]  Louisiana Courts consider a list of eighteen illustrative factors when deciding whether to hold that several entities constitute a single business enterprise.[47]  CGH makes reference to the fact that Khodr owns both Uptown Grill and Grill Holdings but fails to mention single business enterprise or provide any analysis.

Common ownership, standing alone, is insufficient to establish that several entities constitute a single business enterprise.[48]  Accordingly, in the complete absence of any additional evidence implicating the factors, the Court simply cannot consider a single business enterprise allegation.  The Court must, therefore, hold that the License Agreement had no effect on the rights acquired by Uptown Grill in the Bill of Sale.

### III. Laches

CGH also argues that Uptown Grill's declaratory judgment action should be dismissed based upon the equitable remedy of laches.  "Laches are an

---

[45] *Green v. Champion Ins. Co.*, 577 So. 2d 249, 257 (La. App. 1 Cir. 1991).

[46] *Id.* at 257.

[47] *Id.*

[48] *Town of Haynesville, Inc. v. Entergy Corp.*, 956 So. 2d 192, 197 (La. App. 2 Cir. 2007) ("The involvement of a sole or majority shareholder in a corporation is not sufficient alone to establish a basis for disregarding the corporate entity").

inexcusable delay that results in prejudice to the defendant."[49]   In order to prevail on the affirmative defense of laches, a defendant must prove that (1) plaintiff delayed in asserting the rights at issue, (2) the delay is inexcusable, and (3) defendant has suffered undue prejudice as a result of the delay.[50]   CGH has not cited a single case supporting its ability to assert laches as a defense to this action, and the Court has not located one.

Moreover, even assuming that CGH could assert the defense, it cannot prove that Uptown Grill delayed filing this action.   CGH argues that Uptown Grill delayed filing this action until eight years after the Bill of Sale was executed.   This contention misses the point.   Uptown Grill brought this action for declaratory judgment in response to the action brought in this Court by CGH. On July 23, 2013, CGH filed a Complaint against Grill Holdings alleging trademark infringement related to the continued operation of Camellia Grill.[51] After CGH moved to voluntarily dismiss that action, but before the Court ruled on the motion, this action was filed.   Indeed, Uptown Grill filed this action seeking a declaration that the continued operation of the Carrollton Avenue restaurant does not constitute trademark infringement less than five months after the CGH first asserted a trademark infringement claim against it.   It cannot be said that Uptown Grill unreasonably delayed in asserting this claim and any defense of laches must, therefore, fail.

---

[49] *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 622 (5th Cir. 2013).

[50] *Id.*

[51] *See Camellia Grill Holdings, Inc. v. New Orleans City et al*, No. 13-5148, Doc. 1 (E.D. La. filed July 23, 2013).

18

## IV.  Uptown Grill's Declaratory Judgment Action

In light of the foregoing, the Court grants summary judgment to Uptown Grill.  In the Declaratory Action, Uptown Grill seeks a judgment declaring that it owns all of the intellectual property "within or upon" the Camellia Grill location on Carrollton Avenue and that its continued use of that property does not violate the Lanham Act, 28 U.S.C. § 1114, or any other law.  As outlined in this Order, the Bill of Sale clearly and unambiguously transferred the Camellia Grill trademarks to Uptown Grill.  The Court has not been presented with any evidence indicating that Uptown Grill has divested itself of the trademarks. Accordingly, the Court concludes that Uptown Grill owns the trademarks "within or upon" the Camellia Grill location on Carrollton Avenue.  The Court will separately issue a judgment in accord with this finding.

Having determined that Uptown Grill has carried its burden to prove that it owns the trademarks, the secondary issue for this Court to address is whether the trademarks transferred to Uptown Grill in the Bill of Sale could be limited to the trademarks "within or upon" the Carrollton Avenue location.  In other words, did CGH retain any interest in Camelia Grill trademarks following the Bill of Sale?

The Court must answer this question in the negative.  It is axiomatic that "ownership of trademarks is established by use, not by registration."[52]  Indeed, even if one acquires ownership of a mark, he only acquires ownership of that

---

[52] *Bd. of Supervisors for Louisiana State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 475 (5th Cir. 2008).

mark within the geographic area in which he is currently using the mark.[53]  At the time of the Bill of Sale, CGH owned the rights to the Camellia Grill trademarks to the extent of its use of the marks.

As mentioned above, there is absolutely no dispute that, CGH used the marks solely in connection with the Carrollton Avenue Camellia Grill restaurant.  Indeed, at oral argument, counsel for CGH conceded that the marks had never been used outside of the Carrollton location.[54]  The Bill of Sale unambiguously transferred ownership of the marks associated with the Carrollton Avenue location to Uptown Grill.  Because CGH only owned the marks in connection with the Carrollton Avenue Camellia Grill restaurant and those marks were sold in the Bill of Sale, the Court must conclude that CGH divested itself of all of its interest in the Camellia Grill trademarks.

The Court itself has doubts about what the parties subjectively intended when they entered into the transactions at issue.  The Court's role in this matter, however, is governed by Louisiana contract law.  Under that law, the Court must first attempt to discern the intent of the parties from the four corners of the contract itself.  If the contract is clear and unambiguous, the Court *must* accept the terms of the contract as reflective of the parties' intent.  That is precisely what the Court has done in this case.  The parties to these contracts were sophisticated businessmen represented by competent counsel.  Now, faced

---

[53] *Union Nat. Bank of Texas, Laredo, Tex. v. Union Nat. Bank of Texas, Austin, Tex.*, 909 F.2d 839, 843 (5th Cir. 1990).

[54] Transcript of Oral Argument at 5:17–20, *Uptown Grill v. Michael Shwartz, et al*, No. 13–6560 (April 29, 2015).

20

with the prospect that the Bill of Sale does not say what they subjectively intended it to say, the Shwartz parties ask the Court to rescue them from the consequences of the contract they signed.  The Court declines this invitation. Accordingly, for the reasons set forth above, the Court concludes that Uptown Grill owns all of the Camellia Grill trademarks.

## CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (Doc. 194) is GRANTED, and the Court will issue judgment for Plaintiffs in 13–6560.

New Orleans, Louisiana, this 9th day of July, 2015.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**